UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSHUA TATE ALLEN,

                    Plaintiff,              Case No. 12-11261
                                          Honorable Arthur J. Tarnow
                                          Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [9, 13]**

Plaintiff Joshua Tate Allen ("Allen") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [9, 13], which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.      RECOMMENDATION**

For the reasons set forth below, the court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Allen was disabled for the closed period from November 7, 2007 through April 30, 2009, but was no longer disabled beginning on May 1, 2009. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [13] be GRANTED, Allen's Motion for Summary Judgment [9] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the Commissioner's decision be AFFIRMED.

## II.     REPORT

### A.     Procedural History

On October 23, 2008, Allen filed applications for DIB and SSI, alleging a disability onset date of August 15, 2007.[1]  (Tr. 158-68).   These applications were denied initially and upon reconsideration.  (Tr. 79-95).  Allen filed a timely request for an administrative hearing, which was held on February 18, 2011, before ALJ Joseph Donovan, Sr.  (Tr. 38-74).  Allen, who was represented by attorney Andy Carey, testified at the hearing, as did vocational expert ("VE") Suman Srinivasan and medical expert ("ME") Julian Freeman.  (*Id.*).  On March 16, 2011, the ALJ issued a partially favorable decision (for a closed period of disability), finding that Allen was disabled between November 11, 2007 and May 1, 2009.  (Tr. 13-25).  The ALJ further found that, on May 1, 2009, medical improvement occurred that was related to Allen's ability to work, and, from that date through the date of the decision, Allen had the residual functional capacity to perform a significant number of jobs that existed in the national economy.  (*Id.*).  Consequently, the ALJ found that Allen's disability ended on May 1, 2009.  (*Id.*).  On February 2, 2012, the Appeals Council denied review of the adverse portions of the ALJ's ruling.  (Tr. 1-3).  Allen then filed for judicial review of the final decision on March 21, 2012 [1].

### B.     Background

#### 1.     *Disability Reports*

In an October 23, 2008 disability field office report, Allen reported that his alleged onset date was August 15, 2007.[2]  (Tr. 247).  The claims examiner noted that, during a face-to-face

---

[1] Allen previously filed DIB and SSI applications in January of 2008, which were denied in March of 2008.  (Tr. 79-86, 147-57).  The ALJ reopened and revised these applications in his May 2011 decision.  (Tr. 13).

[2] There seems to be no debate that Allen's onset date actually was November 7, 2007, when he fell from a tree stand and injured his lower back.  (Tr. 19; Doc. #9-2 at 1, fn. 5).

2

interview, Allen "appeared very stiff and was not able to sit when he first got here.  He tried off and on and moved very gingerly and would frequently stand again.  He appeared uncomfortable." (Tr. 250).

In an October 23, 2008 disability report, Allen indicated that his ability to work was limited by chronic lower back pain, damaged nerves, degenerative disc disease, and a bulging disc. (Tr. 252).  When describing how these conditions limited his ability to work, Allen stated:

> Can't lift more than 5 lbs., can't sit, bend, rotate, stand more than 2 minute.  Range of motion is 5 degrees.

(*Id.*).  Allen reported that these conditions first interfered with his ability to work in June of 2007, and that he became unable to work on August 15, 2007.  (*Id.*).

Allen completed high school but had no further education.  (Tr. 257).  Prior to stopping work, Allen worked in numerous jobs, including laborer, painter/welder, and operator.  (Tr. 253).  The job he held the longest was that of painter/welder (from 1999-2004).  (*Id.*).  In that job, he painted utility trailers, mixed paint, and did some welding.  (*Id.*).  He was required to walk and stand nine hours per day; stoop and kneel seven hours per day; climb 5.5 hours per day; crouch and reach eight hours per day; and handle, grab, or grasp big objects seven hours per day.  (Tr. 253-54).  He was frequently required to lift 25 pounds (and had to lift up to 100 pounds) and supervised two people.  (Tr. 254).  Allen was evaluated for Job Education Training on September 23, 2008, but he indicated that "the interviewer said [he is] not a candidate for work now."  (Tr. 258).

Allen indicated that he had treated with several medical providers regarding his back pain.  (Tr. 254-56).  At the time of the report, he was taking Motrin (for inflammation) and Norco (for back pain), neither of which caused any side effects.  (Tr. 257).  He further reported that he had had an MRI/CT scan of his lower back in October of 2008.  (*Id.*).

In a function report dated November 9, 2008, Allen reported that he lives in a house with his family. (Tr. 287). When asked to describe his daily activities, Allen indicated that he gets up, watches the news, stretches his back, takes his medication, talks with family members (in person and on the telephone), and attempts to walk a ½ block (which sometimes he cannot do because of pain). (*Id.*). Allen is not able to care for his pets or children; his girlfriend does these things. (Tr. 288). Prior to the onset of his condition, he was able to bend, run, reach, carry weight, lift his children, stand, and walk, but he can no longer do these things. (*Id.*). His condition interferes with his sleep, and he wakes up during the night to adjust his body or take pain medication. (*Id.*). He has trouble getting dressed, bathing, caring for his hair, shaving (his girlfriend helps him with this), feeding himself (he can only use his right arm), and using the toilet. (*Id.*). He does not need reminders to take care of personal needs or grooming or to take medication. (Tr. 289). Allen is not able to prepare his own meals because he cannot lift, twist, bend, or stand for long periods of time. (*Id.*). The only housework he does is rinsing dishes, approximately twice a month, and he does no yard work. (Tr. 289-90). He goes outside once or twice a week and rides in a car, but does not drive. (Tr. 290). He goes shopping once a week, and he is able to pay bills, count change, and handle a checking account. (*Id.*). His hobbies include watching football and racing on television, which he does every weekend, but he can no longer play with his children, run with his dog, or attend school activities. (Tr. 291). He spends time with family, both in person and on the telephone, once or twice a week and regularly goes to Wal-Mart and the doctor's office. (*Id.*). He does not have any problems getting along with family, friends, or neighbors. (Tr. 292).

When asked to identify functions impacted by his condition, Allen checked lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing

tasks, and using his hands.  (*Id.*).  He can lift only five pounds and can walk only ½ block before needing to rest for two minutes.  (*Id.*).  He has no trouble following written or spoken instructions, but he "just can't do them."  (*Id.*).  He says that he gets along "very well" with authority figures and has never been fired from a job because of problems getting along with other people.[3]  (Tr. 293).  He does not handle changes in routine well.  (*Id.*).

In a June 11, 2009 disability appeals report, Allen reported that his condition had changed since his last report.  (Tr. 303).  Specifically, he had a "transfusion with screws" performed on his lower back on February 17, 2009.  (*Id.*).  Since that time, Allen had been unable to bend, twist, reach, hold, run, and climb.  (*Id.*).  Additionally, he had been unable to stand for longer than six hours, sit for longer than four hours, or lift more than ten pounds.  (*Id.*).  He was taking Loricet/Percocet (for pain) and Vicodin/Motrin/Restoril (for pain and as a sleep aid).  (Tr. 305).  Since his last report, he had undergone an MRI/CT scan of his lower back (in February of 2008) and an x-ray of his lower back (in May of 2009).  (*Id.*).

           2.   *Plaintiff's Testimony*

At the February 18, 2011 hearing before the ALJ, Allen testified that he stopped working in 2007 after he was injured when he fell out of a tree.  (Tr. 42).  He no longer has a driver's license, because it was suspended or revoked after he was arrested for driving under the influence.  (Tr. 48-49).

Allen testified that he can sit for 15-20 minutes, stand for 15-20 minutes, and walk approximately three blocks (when he is walking, though, he has "shooting pains" in the back of his legs).  (Tr. 45).  He cannot crouch, crawl, or reach in all directions with both arms; he can, however, reach overhead with his right arm (he is right-handed).  (Tr. 46).  Using both hands, he

---

[3] Interestingly, on a prior disability report, Allen indicated that he had been fired from a job because of problems getting along with other people.  (Tr. 241).

can lift eight pounds.  (Tr. 47).

### 3.    Medical Evidence

#### (a)    Treating Physician Records

The record contains a significant amount of medical evidence pertaining to Allen's lower back condition, which will be discussed in chronological order below.

#### (1)    2007

On November 9, 2007, Allen saw his primary care physician, Dr. Michael Stack, after he had fallen out of a tree stand two days earlier and landed on his left side.  (Tr. 444).  He complained of sharp pain in his lower back that radiated down his left leg.  (*Id.*).  On examination, Allen had tenderness and tenseness in the paraspinous muscles of the lumbosacral spine and a positive straight leg raise test.  (*Id.*).  Dr. Stack diagnosed left-sided sciatica and prescribed Vicodin, Motrin, and Flexiril.  (*Id.*).

On November 16, 2007, Allen underwent an MRI of his lumbar spine, which showed paracentral disc protrusion at L5/S1 extending to both sides, especially the left where there was impingement upon the left lateral recess and left intervertebral foramina.  (Tr. 327).  On November 27, 2007, Allen saw Dr. Stack again, who indicated that the MRI results were consistent with his previous diagnosis of left-sided sciatica.  (Tr. 445).  Allen was prescribed Norco and Motrin for pain and was advised to start physical therapy.  (*Id.*).

#### (2)    2008

On January 11, 2008, Allen returned to see Dr. Stack, saying that his back pain was "no better, even after physical therapy,"[4] and a follow-up MRI was ordered.  (Tr. 447).  This MRI,

---

[4] It appears from the record that Allen attended physical therapy between January 8, 2008 and February 12, 2008.  (Tr. 354-56).  During this period of time, however, Allen attended five appointments, cancelled four appointments, and was a "no show" on three occasions.  (*Id.*).

6

performed on January 19, 2008, showed left paracentral disc protrusion at L5/S1, extending toward the left neural foramen, similar to the previous study. (Tr. 326). On February 14, 2008, Allen complained to Dr. Stack of worsening back pain; he was prescribed MS Contin and referred to the pain clinic. (Tr. 448).

On March 14, 2008, Allen returned to Dr. Stack, saying that he had not been taking his MS Contin because it made him sick and requesting new pain medication. (Tr. 449). Dr. Stack prescribed Fentanyl patches and advised him that he should see a back pain specialist "given the complicated nature of his condition." (*Id.*). On March 25, 2008, Allen again saw Dr. Stack, requesting that the doctor "up the dose on his Vicodin." (Tr. 451). On April 8, 2008, Allen returned to Dr. Stack, saying that his low back pain persisted but was "controlled with his current medication." (Tr. 452). He was diagnosed with chronic low back pain and advised that he would "likely need to go through job retraining to obtain a position that does not require physical labor." (*Id.*).

On April 15, 2008, Allen saw Dr. Subhash Gupta at the pain clinic for an initial evaluation. (Tr. 371-72). On examination, Dr. Gupta noted increased pain with lateral bending, numbness to pin prick in the left lower extremity, tenderness of the lumbar spine centrally, and tenderness to palpation of the bilateral lumbar facet joints. (Tr. 372). Dr. Gupta diagnosed lumbar disc displacement without myelopathy, low back pain, lumbar radiculopathy, and left lower extremity pain and recommended epidural steroid injections. (*Id.*). Allen received these injections at L4/5, L5/S1, and S1 on April 22, 2008. (Tr. 369). However, on May 20, 2008, Allen returned to Dr. Gupta, saying that the epidural steroid injections had given him only a few days of pain relief, so left lumbar facet blocks were administered. (Tr. 370). At his next visit, on June 24, 2008, Allen indicated that the facet blocks had not provided any relief, and Dr. Gupta

indicated that Allen was "not a candidate for further interventional management." (Tr. 368).  On July 24, 2008, Allen returned to Dr. Stack, complaining that his back pain was worsening and "asking for Oxycontin, by name." (Tr. 454).  Dr. Stack declined to prescribe this medication, instead continuing Allen on Vicodin, and referred him to a back pain specialist. (*Id.*).

During August, September, and October of 2008, Allen continued to visit Dr. Stack, complaining of worsening back pain. (Tr. 457-62).  His dosage of Fentanyl was increased, and it was noted that his pain was "well-controlled" with the increased dose. (Tr. 459).  However, Allen complained on October 15, 2008, that the increased Fentanyl made him sick, so Dr. Stack discontinued this medication and instead prescribed Norco. (Tr. 462).  On October 16, 2008, Allen had another MRI of his lumbar spine, which showed a left-sided paracentral protrusion of the L5/S1 disc with impingement upon the left neural vertebral foramen at L5/S1, stable compared to his January 2008 MRI. (Tr. 393).

On December 9, 2008, Allen saw Dr. Malcolm Field for a neurosurgical consultation. (Tr. 477-78).  Dr. Field noted that Allen had evidence of disk herniation at L5/S1 and, after discussing various treatment options, Allen opted for surgical intervention. (Tr. 478).  On December 17, 2008, Allen again saw Dr. Stack, indicating that he was scheduled for a laminectomy and that his current medications were "not working well." (Tr. 483).  At that time, Dr. Stack prescribed Oxycontin. (*Id.*).

*(3)     2009*

On January 21, 2009, Allen underwent an MRI of the sacrum and coccyx, which showed discogenic changes at L5/S1 and disc herniation/protrusion to the left at L5/S1, similar to what was reported on the October 2008 MRI. (Tr. 500).  On February 17, 2009, Dr. Gerald Schell (of Saginaw Valley Neurosurgery) performed a lumbar fusion at L5/S1. (Tr. 496).

8

In terms of surgical follow-up, the record indicates that Allen was seen at Saginaw Valley Neurosurgery on three occasions after his fusion surgery. On March 16, 2009, it was noted that Allen was doing "remarkably well." (Tr. 498). He was "back to increasing his activity level" and said that he was feeling "much better than he ha[d] in a very long time." (*Id.*). On May 11, 2009, Allen was again seen for follow-up. (Tr. 648). The physician's assistant who examined him noted that he was "doing quite well," aside from some stiffness and discomfort.[5] (*Id.*). X-rays taken on May 8, 2009 revealed surgical changes at L5/S1 but an otherwise normal lumbar spine. (Tr. 592). He was "up and active at home" and "using very little pain medication," with an "excellent range of motion" and a normal gait. (Tr. 648). He was advised to return in three months with x-rays, or sooner as needed. (*Id.*).

On August 12, 2009, Allen again returned to Saginaw Valley Neurosurgery for follow-up. (Tr. 645). The physician's assistant noted, in relevant part:

> He was doing very well the last time. Unfortunately it seems that he has been over active and he has had some low back pain. Otherwise he seems to be doing well. He told me that he was chasing his son out in the yard a couple of days ago and had a slip and fall. I guess he actually fell forward. He has had some recurring back pain since that time but no radicular type pain.
>
> His exam today really is fairly unremarkable. . . . I think that he really has some normal postoperative changes and I think that he is going to do well. I think that he just needs to be more judicious in his activities as he is only six months postop. . . .
>
> His x-rays look quite excellent. We are seeing a very good fusion result.

(*Id.*). Allen was advised to return in four months with x-rays, or sooner as needed.

X-rays performed on December 14, 2009 showed post-surgical changes, as well as

---

[5] Despite the fact that he reportedly was doing well, Allen requested a refill on his Lyrica. (Tr. 648). He was advised, however, that "it was time to get him off of that," and it would not be refilled. (*Id.*).

degenerative narrowing of the L5/S1 disc.  (Tr. 630).  On December 23, 2009, despite the fact

that there is no indication in the record that Allen returned to Saginaw Valley Neurosurgery after

August of 2009, Dr. Schell drafted a letter regarding Allen.  (Tr. 603).  In that letter, Dr. Schell

indicated that Allen was recovering from a lumbar fusion and said:

> We would not expect that [Allen] is going to be able to do aggressive
> work.  He will need to have considerable restrictions, and we hope that we
> can get him into occupational med here and physical therapy in about a
> year or so following that surgical intervention.  From this point in time he
> has been quite disabled as a result of his back condition.

(*Id.*).  Dr. Schell did not specify what these "considerable restrictions" entailed.

During the initial part of 2009, Allen continued to follow up with Dr. Stack, primarily to

refill his pain medications.  On April 15, 2009, Allen reported that his back pain was improving

after surgery and that he intended to start physical therapy in six weeks.  (Tr. 576).  Two weeks

later, he was continuing to experience low back pain and was still wearing a brace.  (Tr. 577).

On May 29, 2009, Allen indicated that he was continuing to have some back pain, which was

"well controlled with his current medications."  (Tr. 579).  On July 7, 2009, Allen again saw Dr.

Stack for a medication refill, indicating that he was "able to function because of his

medications."  (Tr. 583).  The records indicate, however, that just two weeks later, Dr. Stack

discharged Allen because he violated the terms of a pain management contract he had signed in

October of 2008.  (Tr. 584).  Shortly after that, Allen began treating with Dr. Adriss Faraj at the

Gratiot Medical Center.  Allen saw Dr. Faraj on three occasions in 2009, each time complaining

of back pain and seeking refills of his pain medication.  (Tr. 598-600).

*(4)     2010*

Allen saw Dr. Faraj on January 4, 2010 and March 17, 2010, again complaining of low

10

back pain and seeking prescription refills.[6]   (Tr. 631-32).   On March 23, 2010, Dr. Faraj completed a Lumbar Spine Questionnaire[7] in which he diagnosed Allen with chronic low back pain secondary to herniated lumbosacral disc, and rated his prognosis as "good."   (Tr. 605). Clinical findings included a limited range of motion in the back (with a mild limitation leaning forward) and mild tenderness over the lower lumbar vertebra.   (*Id.*).   Allen's gait was normal, he had no muscle weakness, and a negative straight leg raising test.   (Tr. 606).   Dr. Faraj also noted that Allen's MRI showed left sided paracentral disc protrusion at L5/S1 with impingement.   (*Id.*). In Dr. Faraj's words, Allen's primary symptom was "chronic lower back pain controlled on long term narcotics."   (*Id.*).

Dr. Faraj opined that Allen was able to sit less than 1 hour in an 8 hour workday, stand and/or walk for 2 hours in an eight hour workday, and needed to get up and move around every 30 minutes.   (Tr. 607-08).   Dr. Faraj further opined that Allen could occasionally lift 20 pounds and frequently lift 10 pounds.   (Tr. 608).   According to Dr. Faraj, Allen would need to take unscheduled breaks every 30 minutes during an 8 hour workday.   (Tr. 610).   He had good days and bad days, but would only be absent from work about once a month.   (*Id.*).   Allen could engage in no pushing, pulling, bending, or stooping.   (*Id.*).

On April 5, 2010, Dr. Faraj stated in a letter that Allen was under his care for lower back pain that began when he "fractured his lower lumbar spine"[8] after falling from a tree.   (Tr. 613). Despite a lumbar fusion in 2009, which "resulted in some improvement in his back pain," Allen

---

[6] During this period of time, Allen also began physical therapy.  His initial evaluation occurred on January 11, 2010, and he attended six more sessions during January, February, and March 2010, before he stopped scheduling appointments and participating in physical therapy.  (Tr. 658-59, 666, 694).

[7] On February 8, 2011, Dr. Faraj updated his responses to this Lumbar Spine Questionnaire, indicating that Allen's condition remained the same.

[8] As discussed above, there is no evidence that Allen ever fractured his spine.

11

continued to complain of difficulty lifting heavy objects and with prolonged standing.  (*Id.*).  Dr. Faraj advised Allen to keep active within his limits, but to avoid heavy lifting, strenuous exercise, and prolonged sitting and standing.  (Tr. 613-14).  Dr. Faraj did not expect complete resolution of Allen's pain and believed that he would continue to have "moderate physical limitation" for more than 12 months.  (Tr. 614).

Allen continued to follow up with Dr. Faraj during 2010, each time complaining of low back pain and requesting refills of his medication.  (Tr. 634, 706, 708).  On October 16, 2010, Allen underwent another MRI of his lumbar spine, which showed post-surgical changes at L5/S1, but no abnormal enhancing area, spinal canal stenosis, disc abnormality, or intervertebral foraminal impingement.  (Tr. 709).  On December 16, 2010, Allen again saw Dr. Faraj, insisting that he was in a lot of pain "requiring Vicodin."  (Tr. 720).  At that time, Dr. Faraj questioned whether Allen had a narcotics addiction and indicated an intent to discontinue narcotics.  (*Id.*).

(b)     *Consultative and Non-Examining Sources*

On May 15, 2008, a physical residual functional capacity ("RFC") assessment was conducted.  (Tr. 360-67).  Jeffry Forsythe, a state agency medical consultant, examined Allen's medical records and concluded that he retained the ability to occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for 6 hours in an 8-hour workday, sit for 6 hours in an 8-hour workday, and that he was not limited in the ability to push or pull.  (Tr. 361).  Forsythe further concluded that Allen could never climb ladders, ropes, or scaffolds.  (Tr. 362).  Forsythe also noted that his review of the records suggested a pattern of injuries indicating that Allen was "seeking some pain medication at various sources."  (Tr. 367).

On April 15, 2009, another physical RFC assessment was conducted.  (Tr. 509-16).  At that time, Gary Macaulay, a state agency single decisionmaker, examined Allen's medical

records and concluded that he retained the ability to occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for 6 hours in an 8-hour workday, sit for 6 hours in an 8-hour workday, and that he was limited in the ability to push or pull with his lower extremities. (Tr. 510). Specifically, Macaulay indicated that Allen needed to alternate between sitting and standing every 60 minutes for 1-4 minutes, and that he could not use his left lower extremity to operate foot controls. (*Id.*). Macaulay further noted that improvement of function was expected by August of 2009. (Tr. 514).

Allen also saw Dr. Thomas Haverbush, an orthopedic surgeon, for a consultative examination on April 21, 2010. (Tr. 620-23). Dr. Haverbush noted that Allen complained of lower back pain that had not resolved with surgery. (Tr. 620). On examination, Allen had tenderness in the bilateral lumbar regions and in the mid-line of the lumbar sacral joint and decreased range of motion in all planes. (*Id.*). Dr. Haverbush diagnosed chronic left and right low back pain, lumbar degenerative joint disease, status post-lumbar fusion at L5/S1, status post-laminectomy/decompression, and disc disorder at L5/S1. (Tr. 622). He further indicated a belief that there was "very little chance" that Allen's symptoms would decrease with or without treatment. (Tr. 623).

### 4.    *Medical Expert's Testimony*

Medical expert ("ME") Julian Freeman testified at the hearing. (Tr. 50-61). He testified that Allen met the criteria of Listing 1.04A (disorders of the spine) from the time he fell from the tree stand (in November 2007) until three months after his fusion and laminectomy (May 1, 2009). (Tr. 52-53). After May 1, 2009, the ME opined that Allen would still have some limitations stemming from his fusion, as well as the degenerative arthritis in his knee. (Tr. 53). Specifically, the ME opined that Allen would be limited to lifting up to 10 pounds frequently and

20 pounds occasionally; standing for 1 to 2 hours at a time for 4 hours total in an 8-hour day;

walking 10-15 minutes at a time for 4 hours total in an 8-hour day; sitting for an unlimited

amount of time each day; occasional climbing of stairs; and no work in unprotected heights,

ropes, ladders, or scaffolds.  (Tr. 53-54).

5.      *Vocational Expert's Testimony*

Suman Srinivasan testified as an independent vocational expert ("VE").  (Tr. 61-73).  The

VE characterized Allen's past relevant work as ranging from unskilled to skilled in nature, and

varying from light to heavy in exertion.  (Tr. 62-63).   The ALJ asked the VE to imagine a

claimant of Allen's age, education, and work experience, who was limited as follows:

> . . . lift and carry 10 pounds frequently, 20 occasionally.  Sit would be
> unlimited within an eight-hour day with a sit/stand option secondary to
> pain and discomfort in the back and the lower extremities.  The standing
> and walking would be walking alone, 10 to 15 minutes at a time for a half
> mile duration.  Standing would be one to two hours at a time, four hours a
> day.  Use of hand and arm controls would be frequently, but assuming
> with no overhead reaching – type of hand controls, otherwise,
> occasionally.  Use of foot and leg controls frequently.  Feeling frequently.
> Fingering, handling, reaching and reaching overhead, I'm going to address
> all as occasional secondary to problems with the spine, which limits the
> range of motion to only occasional overhead.  Limit on ladders, ropes, and
> scaffolds, never – or ramps and stairs would be occasional.  Balancing
> occasionally.  Stooping occasionally.  Kneeling occasionally.  Crouching,
> crawling, never.  Bending occasionally.  No limitation on chemicals,
> fumes or extremes of temperature, dust, dog/cat dander.  Avoid all
> unprotected heights as the moving machinery and vibrations and
> secondary to perceptions and discomfort of pain for which the person
> takes medication.  The person could reasonably be expected to be off task
> two to five percent of the workday with zero loss of work or productivity.

(Tr. 64).  The VE testified that the hypothetical individual would not be capable of performing

Allen's past relevant work.  (Tr. 65).  However, the VE testified that the hypothetical individual

would be capable of working in the positions of information and record clerk (1,375 jobs in

Michigan, 56,609 jobs nationally), rental clerk (2,153 jobs in Michigan, 110,343 jobs nationally),

and protective service worker (403 jobs in Michigan, 16,686 jobs nationally).  (Tr. 65-68).  Upon

14

further questioning, the VE testified that if the hypothetical individual could only sit for 30 minutes at a time, and needed to take a 10-minute break in between each period of sitting as a result of pain, he would be precluded from competitive work.  (Tr. 71-73).

### C.    Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing

20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

If a claimant is found to be disabled during this five-step process, the ALJ must determine whether the claimant's disability continues through the date of the decision or whether the claimant is instead only entitled to a closed period of disability. This is accomplished by applying the "medical improvement" standard articulated at 20 C.F.R. §404.1594 (for DIB claims) and 20 C.F.R. §416.994 (for SSI claims). *See, e.g., Love v. Commissioner of Soc. Sec.* 605 F. Supp. 2d 893, 903-04 (W.D. Mich. 2009); *Long v. Secretary of Health & Human Servs.*, 45 F.3d 430 (6th Cir. 1994).

With one exception,[9] the medical improvement analysis is the same for DIB and SSI claims and involves determining the following: (1) whether the claimant has an impairment or combination of impairments that meets or equals in severity a listed impairment; (2) whether the claimant has experienced "medical improvement"[10] in his condition; (3) whether the claimant's medical improvement has resulted in an increase of his RFC; (4) whether the claimant's current impairments are in combination severe; (5) if the claimant's current impairments are severe, whether the claimant's RFC precludes the performance of his past relevant work (if not, the claimant will be found to not be disabled); and (6) if the claimant's RFC does preclude the

---

[9] The medical improvement analysis applicable to DIB claims also asks whether the claimant is performing substantial gainful activity, which is not relevant in this case. *See* 20 C.F.R. §404.1594(f)(1).

[10] Medical improvement is defined as "any decrease in the medical severity" of the impairments on which the determination of disability was based, as established by improvement in symptoms, signs, and/or laboratory findings. *See* 20 C.F.R. §§404.1594(b)(1), 416.994(b)(1).

performance of his past relevant work, whether there exists other work that the claimant can perform despite his limitations.   *See Love,* 605 F. Supp. 2d at 904 (citing 20 C.F.R. §§404.1594(f), 416.994(b)).

**D.    The ALJ's Findings**

Following the analyses described above, the ALJ found that Allen was disabled under the Act for the closed period from November 7, 2007 through April 30, 2009.  At Step One, the ALJ found that Allen has not engaged in substantial gainful activity since August 15, 2007, his alleged onset date. (Tr. 17).  At Step Two, the ALJ found that Allen has the severe impairments of disc herniation with impinged nerve root resulting in chronic back pain syndrome.[11]  (*Id.*).  At Step Three, the ALJ found that, from November 7, 2007 through April 30, 2009, Allen's back impairment met the criteria of Listing 1.04A (disorders of the spine).  (Tr. 19).  The ALJ further concluded, however, that beginning on May 1, 2009, medical improvement occurred such that Allen's back impairment no longer met the requirements of Listing 1.04A.  (*Id.*).

The ALJ then assessed Allen's RFC, concluding that, as of May 1, 2009, Allen has had the RFC to:

> . . . lift and carry 10 pounds frequently and 20 pounds occasionally; stand for 1 to 2 hours at a time for 4 hours total in an 8 hour day; walk 10-15 minutes at a time for 4 hours total in an 8 hour day; sit for an unlimited amount of time with an at-will sit/stand option; occasionally use overhead hand and arm controls; frequently use regular hand, arm, foot, and leg controls; frequently feel; occasionally finger, handle objects, reach, reach overhead, climb ramps and stairs, balance, stoop, kneel, and bend; never climb ladders, ropes, and scaffolding, crawl, or crouch; avoid all unprotected heights, hazardous machinery, and vibrations; and be on task for at least 95% of the day with no loss in productivity.

(Tr. 20-23).  At Step Four, the ALJ determined that, at all relevant times, Allen has been unable

---

[11] The ALJ found that Allen's left knee impairment was non-severe.  (Tr. 18).  Allen does not challenge this conclusion.

to perform his past relevant work.  (Tr. 23).  At Step Five, however, the ALJ concluded, based in part on the VE's testimony, that, since May 1, 2009, Allen has been capable of performing a significant number of jobs that exist in the national economy.  (Tr. 24-25).  As a result, the ALJ concluded that Allen's disability ended on May 1, 2009.  (Tr. 25).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an

examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F. Analysis

Allen argues that the ALJ erred in: (1) failing to properly weigh the medical evidence for the period after April 30, 2009; (2) failing to properly evaluate Allen's credibility; and (3) relying upon flawed VE testimony. Each of these arguments will be addressed in turn.

#### 1. The ALJ's Consideration of the Medical Source Opinions is Supported by Substantial Evidence

In his motion for summary judgment, Allen argues that the ALJ gave too little weight to the opinions of treating physicians Dr. Faraj and Dr. Schell and too much weight to the opinion of the ME, Dr. Freeman. (Doc. #9-2 at 11-16). A review of the record, however, indicates that the ALJ's conclusions are supported by substantial evidence.

##### a. The Opinions of Allen's Treating Physicians

An ALJ "'must' give a treating source opinion controlling weight if the treating source

opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'"  *Blakely v. Commissioner of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (internal quotations omitted). While treating source opinions are entitled to controlling weight under these circumstances, it is "error to give an opinion controlling weight simply because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole.  Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996); *see also Warner v. Commissioner of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("Treating physicians' opinions are only given such deference when supported by objective medical evidence.").  If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, "considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician."  *Id.* (citing *Wilson v. Commissioner of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)); *see also* 20 C.F.R. § 404.1527(c)(2) (ALJ must "give good reasons" for weight given to treating source opinion).

### (1)     Dr. Faraj

Dr. Faraj, who began treating Allen in August of 2009 (after Dr. Stack discharged him for violating his pain management contract), submitted written opinions in March and April of 2010. In those opinions, Dr. Faraj characterized Allen's limitations as "moderate" and his prognosis as "good."  (Tr. 605, 614).  Dr. Faraj further opined that Allen could lift 10 pounds frequently and 20 pounds occasionally, sit for less than 1 hour in an 8 hour workday, and stand and/or walk for 2 hours in an eight hour workday.  (Tr. 608).  According to Dr. Faraj, Allen would only need to

20

miss work about once a month.  (Tr. 610).  Dr. Faraj further indicated that Allen should keep active within his limits.  (Tr. 613).

In his motion, Allen argues that the ALJ should have given controlling weight to Dr. Faraj's opinion because it was consistent with "clinical and objective evidence of a limited range of motion in the back with mild limitations leaning forward, mild tenderness over the lower lumbar vertebra, and MRI findings."  (Doc. #9-2 at 13).  Allen notes that these findings were similar to those later reported by Dr. Haverbush.  (*Id.*).  He argues that the ALJ erred in rejecting Dr. Faraj's opinions "based on a single note that Mr. Allen was 'running around' with his children in the fall of 2009 and based on the ALJ's conclusion that Plaintiff's pain was well-controlled with medication."  (*Id.* at 14).  Allen's arguments are without merit.

As an initial matter, it is important to note that the ALJ did give some weight to Dr. Faraj's opinion, explaining that aside from Dr. Faraj's sitting, standing, and walking restrictions, his RFC analysis "does not contradict Dr. Faraj's indications."  (Tr. 23).  Specifically, Dr. Faraj's lifting and carrying restrictions are consistent with those found by the ALJ.  (Tr. 20, 608).  Moreover, Dr. Faraj opined that Allen needed to get up and move around every 30 minutes, while the ALJ found that Allen should be allowed to alternate between sitting and standing at will.  (Tr. 20, 608).  The fact that the ALJ did not completely reject Dr. Faraj's opinion is significant. *See Warner*, 375 F.3d at 391-92 ("[W]e find it significant that the administrative law judge did not reject wholesale the conclusions of Dr. Sonke and indeed incorporated [some of] Dr. Sonke's conclusions . . . .").

The ALJ did reject Dr. Faraj's limitations on sitting, standing, and walking, saying that these limitations did "not comport with the medical evidence of record."  (Tr. 22-23).  In support of this conclusion, the ALJ noted that: (1) the evidence showed Allen "running around with his

children in the fall of 2009;" and (2) Dr. Faraj's own records indicate that Allen's pain was controlled on Norco and Vicodin through 2010. (Tr. 23). Contrary to Allen's arguments, the ALJ's conclusions in this respect are supported by substantial evidence.

The note referenced by the ALJ clearly indicates that Allen was "over active . . . chasing his son out in the yard . . . and had a slip and fall." (Tr. 645). It was noted at the time that his x-rays looked "quite excellent" and that he was "going to do well . . . he just need[ed] to be more judicious in his activities . . . ." (*Id.*). Moreover, Allen is incorrect in asserting that this "single note" was the only evidence of Allen's increased activity level. As the ALJ explained elsewhere in his opinion,[12] Allen repeatedly reported to doctors that he was feeling better and increasing his activity. (Tr. 18 ("The claimant indicated in March 2009 that he was increasing his activity level and feeling much better . . . In August 2009, the claimant was still doing well and indicated quite a lot of activity"), 21 ("after the claimant's surgery treatment notes indicated that the claimant was doing a lot of activity, including chasing his son around in the yard")). Other record evidence further supports the ALJ's findings in this respect. (*See, e.g.,* Tr. 498 (Allen "doing remarkably well" and "back to increasing his activity level" in March 2009), 648 (Allen "up and active at home" in May 2009), 583 (Allen "over active" in August 2009)). The ALJ did not err by considering Allen's activity level in determining how much weight to give to Dr. Faraj's opinion.

Next, Allen argues that the ALJ "fail[ed] to cite any evidence" in support of his conclusion that Allen's medications controlled his pain. (Doc. #9-2 at 14-15). This is false. The ALJ explicitly cited to Dr. Faraj's treatment records, which noted that Allen's back pain was

---

[12] The ALJ's decision should be read as a whole. *See Jones v. Secretary of HHS*, 1985 WL 12990, at *2 (6th Cir. Feb. 8, 1985) ("[T]he reviewing court may recognize and accept findings implicit in the decision taken as a whole.").

"controlled with Norco" but that Allen "prefer[red] Vicodin." (Tr. 706, 708). Moreover, at other points in the ALJ's decision, he cited specific medical records showing that Allen's pain was controlled with medication.[13] (*See, e.g.,* Tr. 18). Allen's reliance on three pages of medical records indicating that, on occasion, his pain was not controlled with medication is not persuasive. The ALJ's conclusion is supported by substantial evidence, and the mere fact that portions of the medical record could have been construed to support a different conclusion does not warrant reversal. *See Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) ("The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.").

Finally, Allen argues that even if the ALJ correctly concluded that Dr. Faraj's opinion was not entitled to controlling weight, he erred in failing to explicitly discuss each of the factors set forth in 20 C.F.R. §404.1527(c) and §416.927(c). (Doc. #9-2 at 15). As fully discussed above, however, the ALJ explicitly considered some of these factors, including the supportability of Dr. Faraj's opinion and the consistency of the opinion with the record as a whole. Moreover, to the extent that Allen argues that the ALJ was required to discuss each and every factor (such as the length of the treating relationship, the frequency of examination, and Dr. Faraj's specialization (if any)), such an argument fails. An ALJ is not required to discuss every fact or issue when the fact or issue will not significantly impact his decision. *See Kornecky*, 2006 WL 305648, at *10 ("An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party."). Thus, Allen has failed to show that the

---

[13] The record evidence provides further support for the ALJ's finding. (*See, e.g,* Tr. 567 (Dr. Stack indicated that Allen's back pain was "relatively well controlled when he is using Norco"), 575 (Allen was "doing well on current medications"), 576 (Allen's back pain was improving and he had decreased the amount of medication taken), 579 (Allen's back pain was well-controlled with medication), 583 (Allen was able to function because of his medication), 648 (Allen using very little pain medication in May of 2009 and was active and doing well)).

ALJ erred in declining to afford Dr. Faraj's opinion controlling weight.

### (2)   Dr. Schell

Allen also argues that the ALJ erred in giving no weight to the opinion of his treating neurosurgeon, Dr. Schell.  (Doc. #9-2 at 15-16).  This opinion, set forth in a brief letter dated December 23, 2009, stated that Allen was still recovering from his lumbar fusion, required "considerable restrictions" (which were unspecified), and that he had been "quite disabled" as a result of his back condition.  (Tr. 603).

In rejecting Dr. Schell's opinion that Allen was "disabled," the ALJ explained that the question of whether an individual is disabled under the Act is an issue reserved to the Commissioner.  (Tr. 22 (citing 20 C.F.R. §§404.1527(e) and 416.927(e)).  The ALJ's conclusion in this respect was not erroneous.  *See* Soc. Sec. Rul. 96-5p, 1996 WL 374183, at *2 (July 2, 1996) ("[T]reating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance.").  Allen argues, however, that simply because Dr. Schell opined that he was disabled does not render his opinion entirely invalid. While this is true as a general principle, the ALJ did not reject Dr. Schell's entire opinion solely on this basis.   Rather, the ALJ found that Dr. Schell's statement that Allen required "considerable restrictions" was ambiguous and not supported by Dr. Schell's own medical records.  In reaching this conclusion, the ALJ cited to records from Dr. Schell's office that indicated Allen was doing well-post surgery, aside from minor post-operative changes.  (Tr. 22 (citing Tr. 644 (Allen doing "remarkably well"), 645 ("exam today really is fairly unremarkable . . . he is going to do well")).   Thus, the ALJ gave good reasons, supported by substantial evidence, for rejecting Dr. Schell's December 23, 2009 opinion.

Allen also argues that if the ALJ felt that Dr. Schell's opinion was ambiguous, he should

have "fulfilled his affirmative duty to develop the record" by following up with Dr. Schell. (Doc. #9-2 at 16). This argument is without merit. As the Commissioner correctly points out, this kind of development of the record is necessary only when the record is otherwise inadequately developed. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4 (July 2, 1996) ("Ordinarily, development should not be undertaken for the purpose of determining whether a treating source's medical opinion should receive controlling weight if the case record is otherwise adequately developed."). Here, where the record contains adequate information, including multiple physician opinions, hundreds of pages of treatment records, and Allen's own admissions, the ALJ was under no obligation to seek further development.

### b.    The Opinion of ME Dr. Freeman

At the hearing, Dr. Freeman testified as a medical expert, opining that, as of May 1, 2009, Allen could lift 20 pounds occasionally and 10 pounds frequently; sit without limitation; stand for 1 to 2 hours at a time for 4 hours total in an 8-hour day; walk 10-15 minutes at a time for 4 hours total in an 8-hour day; and occasionally climb stairs. (Tr. 53-54). The ALJ gave Dr. Freeman's opinion "great weight," explaining that he was a board-certified physician who was familiar with Social Security regulations, and that his opinion was consistent with the entire record, including post-surgical treatment notes. (Tr. 19, 22).

Social Security rules and Sixth Circuit case law make clear that a non-treating physician's opinion may receive greater weight than that of a treating physician when supported by the record evidence. *See* 20 C.F.R. §404.1527(e)(2)(iii); *see also Smith v. Commissioner of Soc. Sec.*, 1995 WL 469724, at *1 (6th Cir. Aug. 8, 1995); *Daniels v. Commissioner of Soc. Sec.*, 2008 WL 4378079, at *2 (E.D. Mich. Sept. 23, 2008). Here, Allen does not dispute the reasons articulated by the ALJ for giving Dr. Freeman's opinion great weight; instead, he advances other

arguments, none of which have merit.

First, Allen argues that the ALJ should have rejected Dr. Freeman's argument because he is not a specialist. (Doc. #9-2 at 13). As the Commissioner correctly notes, however, Dr. Freeman's specialties were internal medicine and neurology (Tr. 134) and, therefore, he was qualified to testify to Allen's impairments and limitations.

Second, Allen argues that Dr. Freeman reviewed an incomplete medical record and demonstrated unfamiliarity with the available records. (Doc. #9-2 at 13). Specifically, Allen claims that Dr. Freeman "initially stat[ed] that he only had the opportunity to review a single follow-up post-surgery, but later admit[ed] there were additional post-surgical records that showed abnormalities that he did not testify to." (*Id.*). However, a review of the hearing transcript demonstrates that Allen has not accurately summarized Dr. Freeman's testimony. Near the beginning of the hearing, when the parties were discussing exhibits 22F and 23F, Dr. Freeman said that he only had exhibits through 20F. (Tr. 43). Allen's counsel then specifically confirmed that the few missing exhibits were either identical to what Dr. Freeman already had, or contained no new clinical findings. (Tr. 44). Dr. Freeman never stated that he reviewed only a "single" record, as Allen claims; indeed, he testified in detail as to Allen's impairments and limitations, referring to specific record evidence, including evidence post-dating Allen's surgery. (Tr. 50-61). Allen's arguments in this respect, at best, demonstrate a misunderstanding of Dr. Freeman's testimony.

Finally, Allen argues that the ALJ erred in giving great weight to Dr. Freeman's opinion because "Dr. Freeman admitted that in most circumstances a treating physician is in a better position to assess an individual's functional capacity than a non-treating medical source." (Doc. #9-2 at 13). Once again, Allen misstates Dr. Freeman's testimony. At the hearing, Allen's

attorney asked Dr. Freeman whether he agreed that a treating physician "would probably be in a better position to state what he believes the Residual Functional Capacity of the Claimant or patient would be at that time." (Tr. 59). In response, Dr. Freeman indicated that it would depend on whether the treating physician believed the patient's subjective complaints, saying that "the answer would be normally, yes, although not always." (*Id.*). He then added that several studies have shown a "very high error rate on the part of treating physicians." (Tr. 60). Thus, Dr. Freeman did not, as Allen apparently alleges, concede that Allen's treating physicians were better equipped to assess his RFC than was Dr. Freeman himself.

Moreover, even if treating sources typically are in a better position than non-treating sources to evaluate an individual's RFC, it does not necessarily follow that Dr. Freeman's opinion should have been rejected. As set forth above, Dr. Freeman's opinion was consistent with the record as a whole, while significant portions of the opinions of Dr. Faraj and Dr. Schell were at odds with the record evidence. Thus, Allen failed to show that the ALJ erred in assigning weight to these three medical opinions or in his use of them to determine Allen's RFC.

2.    *The ALJ's Credibility Determination is
Supported by Substantial Evidence*

Allen next argues that the ALJ erred in failing to adequately assess the credibility of his subjective complaints of pain. As the Sixth Circuit has held, determinations of credibility related to subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'" *Kirk v. Secretary of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981)*, quoting Beavers v. Secretary of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978). Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). The ALJ is not required to accept a claimant's testimony if it conflicts with

medical reports and other evidence in the record. *See Walters v. Commissioner of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997). Rather, when a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of his pain are credible. *Soc. Sec. Rul.* 96-7p, 1996 WL 374186 (July 2, 1996); *see also* 20 C.F.R. § 404.1529.

In this case, in assessing the credibility of Allen's complaints of debilitating pain and other symptoms during the relevant period, the ALJ considered numerous factors, including Allen's ability to perform an increasing amount of activities, treatment notes showing controlled pain while on medication (without side effects), relatively mild exam and test results, and statements made by Allen to his treating physicians. (Tr. 18-23). Allen fails to address many of the reasons cited by the ALJ for his credibility finding, including the ALJ's consideration of medication side effects, Allen's increasing level of activity, and mild exam and test results.[14] Allen does argue, however, that the ALJ improperly considered the fact that he ceased physical therapy without "considering any explanations" that Allen may have provided, asserting that the ALJ wrongly assumed that it was because Allen's condition had improved. (Doc. #9-2 at 19). A review of the ALJ's decision, however, makes clear that the ALJ made no such assumption; instead, he merely stated, "The record does not indicate why the claimant ceased physical therapy after March 2010." (Tr. 22). This statement is supported by substantial evidence in the

---

[14] Allen does reiterate his objections to the ALJ's consideration of the effectiveness of his medications and the fact that he was "running around" after his son. (Doc. #9-2 at 18-19). As fully discussed above, however, the ALJ properly considered those matters.

record.  (Tr. 694 (Allen discharged from physical therapy after he simply stopped scheduling appointments)).  Moreover, even if the ALJ's statement could be construed in the manner Allen urges, the fact that he did not need more than six physical therapy visits following his fusion surgery, for whatever reason, undermines his claim of ongoing debilitating pain.  *See* Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *7 (July 2, 1996) ("the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints").  Thus, the ALJ's credibility determination is supported by substantial evidence in the record.[15]

### 3.    *The ALJ Reasonably Relied on The Vocational Expert's Testimony*

Lastly, Allen argues that the ALJ's hypothetical questions to the VE were insufficient because they did not account for all of his credible limitations.  (Doc. #9-2 at 19-20).  An ALJ may rely on the testimony of a vocational expert to determine whether jobs would be available for an individual who has workplace restrictions.  *See Wilson*, 378 F.3d at 548.  In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of a conclusion that the claimant can perform other work, the question must accurately portray the claimant's physical and mental impairments.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010).

To the extent that Allen argues that his functional limitations were greater than those

---

[15] Allen also argues that the ALJ applied the "wrong legal standard" in concluding that his statements concerning the intensity, persistence, and limiting effects of his symptoms were "not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (Doc. #9-2 at 17 (citing Tr. 21).  Allen points to a recent Seventh Circuit opinion which criticized the Social Security Administration's repeated use of "template" language in addressing a claimant's credibility.  (Doc. #9-2 at 17-18 (quoting *Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012)).  While Allen is correct that, in this case, the ALJ used the boilerplate language questioned by the Seventh Circuit, the ALJ went well beyond this form language and provided several detailed reasons for discounting Allen's credibility, as discussed above.  Thus, the court does not find that the ALJ inadequately articulated his credibility determination.  *See, e.g., Barbera v. Commissioner of Soc. Sec.*, 2012 WL 2458284, at *14-15 (E.D. Mich. June 5, 2012).

found by the ALJ, the court has already addressed that claim above, finding that the ALJ's determination of Allen's RFC was appropriate and supported by substantial evidence. The ALJ also posed a complete hypothetical question to the VE and reasonably accepted the VE's testimony that the hypothetical individual described could perform work which exists in significant numbers in the national economy. This testimony provides substantial evidence to support the ALJ's finding that Allen was not disabled during the period in question. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (where hypothetical accurately described the plaintiff in all relevant respects, the VE's response to the hypothetical question constitutes substantial evidence).

Because the hypothetical questions the ALJ posed to the VE included all of Allen's credible limitations, the VE's testimony was sufficient and the ALJ was entitled to rely upon it. Therefore, substantial evidence supports the ALJ's determination that, after May 1, 2009, Allen was not disabled.

## III.    CONCLUSION

For the foregoing reasons, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [13] be GRANTED, Allen's Motion for Summary Judgment [9] be DENIED, and the ALJ's decision be AFFIRMED.


Dated: March 14, 2013                                  s/David R. Grand
Ann Arbor, Michigan                                    DAVID R. GRAND
                                                       United States Magistrate Judge


## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific

objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 14, 2013.

s/William Barkholz for Felicia M. Moses
FELICIA M. MOSES
Case Manager